In the Matter of the Application for WATER RIGHTS OF V–HEART RANCH, INC.

Otho BAGWELL, Appellant,

v.

V–HEART RANCH, INC., Appellee.

No. 82SA496.

Supreme Court of Colorado, En Banc.

Nov. 19, 1984.

Rehearing Denied Dec. 10, 1984.

Lucero & Kadinger, P.C., Carlos F. Lucero, Peter L. Comar, Alamosa, for appellant.

Moses, Wittemyer, Harrison & Woodruff, P.C., Timothy J. Beaton, Raphael J. Moses, Boulder, for appellee, V-Heart Ranch, Inc.

1. This court has jurisdiction over appeals in change of water right proceedings. *See* Colo. Const. art. VI, § 2(2); § 13–4–102(1)(d), 6 C.R.S. (1973); § 37–92–304(9), 15 C.R.S. (1973); C.A.R. 1(a)(2).

2. For current version, *see* § 37–92–302, 15 C.R.S. (1973 & 1984 Supp.).

KIRSHBAUM, Justice.

On March 31, 1982, the water judge for Water Division No. 3 granted an application for a change of water right to V-Heart Ranch, Inc. (V-Heart) for 7.54 c.f.s. of water decreed to the Beecroft Irrigating Ditch. Otho Bagwell, who objected to the petition, appeals the water court's conclusions that V-Heart owns the entire 7.54 c.f.s. of the decreed priority and that Bagwell had not acquired ownership of 3.77 c.f.s. of the priority by means of adverse possession.[1] Because we conclude that the water court applied incorrect principles of law in reaching its conclusions concerning Bagwell's claim, we reverse the decree and remand the matter for further proceedings with regard to that issue.

The primary historical facts pertinent to the resolution of this appeal are not controverted. On December 27, 1976, J.J. Kimble, V-Heart's predecessor in interest, filed an application pursuant to section 37–92–302, 15 C.R.S. (1973),[2] for change of water right. The petition requests authorization to alter the point of diversion of 7.54 c.f.s. of water decreed as Priority No. 61 on October 22, 1883, in the unincorporated Beecroft Irrigating Ditch (the Beecroft). Bagwell filed a statement of opposition to the application, asserting that the applicant owned only 3.77 c.f.s. of the decreed priority in the Beecroft and that the proposed change would adversely affect Bagwell's water rights.

In December of 1979, a hearing on the application was conducted before the water referee. On February 26, 1980, the referee concluded that V-Heart owned only one-half of the 7.54 c.f.s. of water decreed to the Beecroft and that Bagwell had acquired the other one-half interest by adverse possession.[3] The referee then approved the

3. The pertinent portion of the referee's decision on this point is as follows:

The Referee is satisfied that objector Bagwell has established his right to a one-half interest in the Beecroft Irrigating Ditch and the water and water rights decreed thereto. It necessarily follows that applicant having an unbroken

application for change of water right, limited to 3.77 c.f.s. of water.

V-Heart filed a protest to the referee's ruling, and the water judge subsequently conducted a hearing on the matter, pursuant to section 37–92–304(3), 15 C.R.S. (1973).[4] The evidence presented to the water judge consisted of a transcript of the earlier hearing, certain exhibits, and testimony by four witnesses who had not appeared before the referee. The water court concluded that V-Heart owned the entire 7.54 c.f.s. of water under the 1883 decree. Its determination of this issue is contained in the following paragraph from the final decree:

9. The Court finds that Objector Otho Bagwell did not adversely possess a one-half interest, or 3.77 c.f.s., of water decreed to the Beecroft Irrigating Ditch. In order to find adverse possession, such possession must be actual, adverse, hostile and under claim of right, and it must be open, notorious, exclusive and continuous. The requirements of adverse possession must be supported by clear and convincing evidence. *Loshbaugh v. Benzel*, 133 Colo. 49, 291 P.2d 1064 (1956). The testimony of Luther Bagwell, father of the Objector, established that the water diverted under the Beecroft Ditch decree was used exclusively at times by V-Heart's predecessors-in-interest, and other times it was used by the Bagwells. Objector Bagwell admits in his brief that the Beecroft Ditch water was exchanged, with V-Heart Ranch or its predecessors-in-interest using all of the Beecroft Irrigating Ditch water during certain periods. The Court therefore finds that the requisite requirements of exclusive and continuous use are not present in this case, and Objector Bagwell has thus not established adverse possession to a one-half interest in the Beecroft Irrigating Ditch. The Court notes that division of the use of the Beecroft Irrigating Ditch water right and other water rights diverted at the common headgate was made on a voluntary basis. Such use does not ripen into adverse possession. *See Loshbaugh v. Benzel, supra.*

The water court approved V-Heart's proposed change of point of diversion in the amount of 7.54 c.f.s. of water, subject to certain conditions. Bagwell's appeal challenges only the water court's resolution of the adverse possession question.[5]

Bagwell's claim of adverse possession is based on section 38–41–101, 16A C.R.S. (1982), which provides that "[e]ighteen years adverse possession of any land shall be conclusive evidence of absolute ownership." Ownership of water rights may be deemed ownership of real property for purposes of adverse possession claims. *See Hitchens v. Milner Land, Coal & Townsite Co.*, 65 Colo. 597, 178 P. 575 (1919); *Davis v. Randall*, 44 Colo. 488, 99 P. 322 (1908). A party seeking to establish ownership of a water right by adverse possession has the burden of establishing that such possession is actual, adverse, hostile and under claim of right, as well as open, notorious, exclusive and continuous for the prescribed statutory period. *Loshbaugh v. Benzel*, 133 Colo. 49, 291 P.2d 1064 (1956); *Rominger v. Squires*, 9 Colo. 327, 12 P. 213 (1886). Bagwell argues that he satisfied his burden of proof in this case, but that the water court erroneously considered our decision in *Loshbaugh* to require rejection of Bagwell's claim. A review of additional

chain of title to, and coupled with use of the other one-half interest, is the owner of an undivided one-half interest only in the Beecroft Irrigating Ditch and the water and water rights decreed thereto. Bagwell claims by adverse possession and user, but against whom? Certainly there is no adverse possession against applicant, so such adverse possession must be against whomever succeeded to the Rodgers interest.

4. For current version, *see* § 37–92–304(3), 15 C.R.S. (1984 Supp.).

5. V-Heart asserts that the only issue before this court is a factual one: whether the evidence supports the water court's ruling. However, both in his motion for new trial and in his statement of issues on appeal, objector asserts that the water court erred in its application of legal principles to the evidence.

factual matters revealed by the record is necessary for a resolution of this assertion.

On October 22, 1883, the Beecroft was adjudicated in the amount of 7.54 c.f.s. of water. During the twenty years immediately following the entry of the decree, two separate chains of title to the Beecroft developed, each representing ownership of one-half of the ditch and the water. In 1904, the two chains of title merged in Beulah Paine. She later conveyed her right to the entire 7.54 c.f.s. of water in the Beecroft to Charles T. Paine and Ruth S. Paine. In 1963, the Paines conveyed their interest in the Beecroft water to Kimble.[6]

In 1946, Bagwell acquired title to property adjacent to the land Kimble later purchased. At the hearing before the referee, Bagwell's father, Luther, testified that the water in the Beecroft had continuously been used to irrigate the Bagwell land since the early 1920's.[7] In response to a question concerning whether the Beecroft

6. The warranty deed conveyed the Paines' interest in a tract of land
   [t]ogether with all water and water rights, ditches and ditch rights ... including particularly but not by way of limitation all of the following described water rights ... to-wit: ... An undivided ½ interest in the Beecroft Irrigation Ditch and the water decreed thereto with Priority No. 61 whose total priority is 7.64 cubic feet of water per second of time as of April 15, 1882.
   Bagwell argued below that this language conveyed only a ½ interest in the Beecroft water to Kimble. The water court's conclusion that the 1963 deed was intended to convey all of the Paines' legal interest in the Beecroft water to Kimble has not been appealed. See § 37–92–304(9), 15 C.R.S. (1973).

7. Luther Bagwell gave the following pertinent testimony at the referee's hearing:
   A  As far as I can remember back it has been used ever since that one-half of that Beecroft Ditch has been used on [the Bagwell] property.
   . . . .
   Q  And who had the use of it in the days of your early recollection?
   A  Well, my father used it. He used it there as long as he lived.
   Q  What was his name?
   A  W.H. Bagwell. Well, I lived on the home place there for, I guess it was—I was about 29 years old then. I lived there five or six years after I was married on the home place. My father moved to Manassa.
   . . . .

was ever out of priority, Luther Bagwell testified as follows:

Not that I know of. Colonel Paine, generally they used about all of the water they wanted there on the hay meadows. Then in the fall on the grain, why they didn't use it. It didn't require it, so we used it on our farm crops. When they was cut off—I don't remember whether they was ever cut off—only they didn't want it any time after a certain season of the year. It was about time for their crops to be harvested so we used it on potatoes and different kinds of grain . . . .

Charles Paine testified as follows at the referee's hearing concerning the actual use of the Beecroft water from the early 1920's until 1963:

Q  If you will, please, insofar as the Beecroft Ditch is concerned, during the time that you were growing up and dur-

Q  Did you ever use any Beecroft water?
A  Yes sir.
Q  That is Priority 61?
A  Yes sir, ever since we owned it.
Q  How much of the water from that Beecroft water did you use, Luther?
A  Well, we were supposed to use half of it. There was never no objections to it. No disagreement with the Paines. I remember when Charlie Paine's father, Colonel Paine is what we used to know him by, when we had to get some water when we got low, we all went together and hauled rocks and fixed the dam and got it into the ditch and it was divided.
. . . .
Q  Did you ever challenge the Paines, or Colonel Paine, or after him the rest of the Paines, their right to use their interest to the Beecroft?
A  No sir.
Q  And did they ever challenge you?
A  Nope.
Q  Now how long did this continue? That you actually had knowledge about this?
A  How long do I remember using the water?
Q  Yes.
A  Well, I used it all the time I was helping my father there and used it all the time until he died in 1928. Then after that, my brother had it and he used that water all of the time until he deeded it over to [Bagwell] and [Bagwell] has used it ever since.

ing the time that you worked with your father, what interest in the Ditch did you assert?

A Well, we usually had a one-half interest in the water, the Beecroft water is what I understood.

Q What was your understanding as to who owned the other one-half?

A The Bagwells owned the other half.

. . . .

Q Was the use by Bagwells made of a one-half interest in the Beecroft from those early days?

A I think so. [There] was no weir at that time. No measuring weir at that time. It was just figured that each one of us would get half of the water.

Q Did you ever challenge their right to take half?

A No sir.

Q Did they ever challenge your right to take half?

A No sir.

Q It was a relationship that continued without anybody interfering with the other person's half, is that accurate?

A That's right.

Bagwell testified that he had openly and continuously claimed a one-half interest in the Beecroft water from 1946 to the present, that the Paines owned the other one-half interest, and that no precise measurements were made of the amount of Beecroft water used at any one time by Bagwell or by the Paines. Kimble testified that in 1963 he was unaware of any claim of Bagwell to a one-half ownership interest in the Beecroft water, that he first learned of such claim in 1975, and that since 1963 all available Beecroft water had on various occasions been used by Bagwell and by Kimble or V-Heart.

▆ Paragraph 9 of the water court's opinion contains both conclusions of law and findings of fact. The water court's description of the testimony of Bagwell and of his father, Luther, is accurate. Furthermore, there is no dispute that at times the

Paines and the Bagwells, by mutual agreement, rotated use of the entire 7.54 c.f.s. of the Beecroft water. The water court concluded that because all of the Beecroft water was at times used by the Paines, Bagwell was precluded as a matter of law from establishing ownership of any of the Beecroft water by adverse possession. That conclusion is erroneous.

The actual patterns of use of water rights are dictated more by day-to-day circumstances than by legal rights of ownership. Informal exchanges and mutual accommodations by owners of water rights occur frequently in response to changes in water levels, weather patterns and crop needs to permit maximum utilization of this critical resource. In view of these necessary practices, the adoption of mutually agreeable rotation systems by the owners of water rights cannot be deemed conclusive proof of either the creation or the abandonment of particular ownership rights. Any such legal presumption would discourage that spirit of cooperation and mutual concern which is essential to the maximum beneficial use of available water.

We are not unmindful of the principle that when ownership of real property by adverse possession is asserted, proof of mixed usage of the disputed land is sufficient as a matter of law to defeat any claim of exclusivity. *Raftopoulos v. Monger*, 656 P.2d 1308 (Colo.1983). We have previously recognized, however, that the realities of water usage dictate a different result when water claimed by adverse possession has been used by persons other than the adverse claimant. For example, in *Hitchens v. Milner Land, Coal & Townsite Co.*, 65 Colo. 597, 178 P. 575 (1919), we recognized that a claimant's failure to use available water during an off-season is not fatal to a claim of ownership of such water rights by adverse possession, even though such non-use could be viewed as a failure to establish continued actual use necessary to such a claim. Thus, a continuous and exclusive scheduled use by claimant may satisfy the burden of proving ownership of water rights even if all the disputed water

is at times used by others. The question becomes whether, under all the surrounding circumstances, such practice is consistent or inconsistent with the claimed adverse use.

■ The water court considered *Loshbaugh v. Benzel,* 133 Colo. 49, 291 P.2d 1064 (1956), as authority for its conclusion that the periodic use by the Paines of all of the Beecroft water defeated Bagwell's adverse possession claim. That case does not establish such rule of law. In *Loshbaugh,* a quiet title action, the plaintiff Benzel asserted a one-half ownership interest in water owned jointly by Benzel and the Loshbaughs. An 1893 decree had awarded P. Lux, a predecessor in interest of Benzel, and W. Crann, the Loshbaughs' immediate predecessor in interest, a one-half interest each in the L & C Ditch with an authorized flow of 40 c.f.s. of water. A separate action filed in 1920 against Crann and others resulted in a determination that only 710 acres of land had been irrigated under the decree and that Crann owned 550 of those acres.

The Loshbaughs installed a divider in the L & C Ditch which directed two-thirds of the available water to their property. Benzel testified that in 1943 the Loshbaughs informed him he could receive one-third of the available water, that he took half the water when he could, and that at times the Loshbaughs used all of the water in the ditch. The Loshbaughs testified that in 1943 they told Benzel he was entitled to only $^{16}/_{71}$ of the water but could use one-third of it, that they frequently used all of the water to irrigate their 550 acres, and that Benzel rarely attempted to irrigate his property with the water. The trial court concluded that the Loshbaughs had recognized Benzel's claim of ownership of one-third of the L & C Ditch water and that the Loshbaughs had acquired ownership of two-thirds of the water by adverse possession. We reversed, concluding that Benzel was entitled to only $^{16}/_{71}$ of the water. The basis of our decision was not, as the water court here assumed, that the Loshbaughs often had control of all of the available

water in the ditch, but rather that the evidence was undisputed that for long periods of time Benzel and his predecessors in interest made no effort to use any of the L & C Ditch water.

*Loshbaugh* in effect recognized the importance of evaluation of all relevant circumstances surrounding the use of water in evaluating adverse possession claims to water rights. The water court's conclusion that as a matter of law V-Heart's occasional use of all the disputed water necessarily precluded Bagwell from establishing his adverse possession claim is erroneous. That conclusion prevented any consideration of the circumstances surrounding the parties' use of the Beecroft water. Such conclusion also rendered unnecessary determination of such additional questions as when, if at all, the eighteen-year period might have been satisfied; whether, during the times V-Heart or its predecessors used all of the Beecroft water, the circumstances of such use support or contradict Bagwell's claim of continuous adverse use; and, ultimately, whether Bagwell sustained his burden of proof.

Such further evaluation of the evidence should be made by the trier of fact, not by this court. We hold only that the water court erred in concluding that as a matter of law the finding that V-Heart occasionally used all the Beecroft water required denial of Bagwell's claim of ownership of 3.77 c.f.s. of the Beecroft water by adverse possession. Accordingly, we remand the case to the water court for further consideration of Bagwell's claim in light of the appropriate legal standards.

Judgment reversed and cause remanded for further proceedings.